**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **AISHAH ZUHRI-PACHECO and** | ) | |
| **ALVIN J. DUNCAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION FILE** |
| **v.** | ) | **NO. _____** |
| | ) | |
| **BOARD OF REGENTS OF THE** | ) | **JURY TRIAL DEMANDED** |
| **UNIVERSITY SYSTEM OF GEORGIA** | ) | |
| **d/b/a GEORGIA INSTITUTE OF** | ) | |
| **TECHNOLOGY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

COME NOW the Plaintiffs, Aishah Zuhri-Pacheco and Alvin J. Duncan, and

state their Complaint against Defendant Board of Regents of the University System

of Georgia d/b/a Georgia Institute of Technology as follows:

**INTRODUCTION**

**1.**

Plaintiffs Aishah Zuhri-Pacheco ("Pacheco") and Alvin J. Duncan

("Duncan") were formerly employed by Georgia Institute of Technology ("Georgia

Tech" or the "Institute") in the Ferst Center for the Arts ("Ferst Center" or the

"Center"). During the course of their respective employments, Plaintiffs suffered

disparate and unequal treatment with respect to their compensation and the terms and conditions of employment, incidents of harassment, and Plaintiffs ultimately were discharged for discriminatory and retaliatory reasons.

**2.**

This action is for unlawful employment discrimination and retaliation brought pursuant to the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").  Plaintiffs are seeking injunctive and declaratory relief, back pay and lost benefits, front pay, and compensatory damages to remedy these civil rights violations.

## JURISDICTION AND VENUE

**3.**

The Court has jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (4), and 42 U.S.C. § 2000e-5(3).

**4.**

Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b), since it is a district where the parties reside and/or where the events giving rise to the claims occurred.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

### 5.

Plaintiffs have satisfied all administrative prerequisites to perfect their claims under Title VII. Specifically, Plaintiffs timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and they subsequently were issued separate Notice of Right to Sue letters from the United States Department of Justice, Civil Rights Division.

### 6.

Plaintiffs bring this suit within ninety (90) days of their respective receipt of the Notice of Right to Sue letters.

## PARTIES

### 7.

Plaintiff Pacheco is an African-American female resident of the State of Georgia over the age of twenty-one (21) and entitled to bring actions of this kind and nature.

### 8.

Plaintiff Duncan is an African-American male resident of the State of Georgia over the age of twenty-one (21) and entitled to bring actions of this kind and nature.

**9.**

Defendant Board of Regents of the University System of Georgia ("Board of Regents") d/b/a Georgia Institute of Technology is a department of the State of Georgia and is subject to the jurisdiction of this Court.

**10.**

Defendant Board of Regents operates, manages and controls the system of universities and colleges, and subdivisions of same, in the State of Georgia pursuant to authority granted by the Constitution of the State of Georgia, Art. 8, § 4, Para. 1.  Georgia Tech is one of the institutions organized pursuant to this grant of authority.  Under the laws of the State of Georgia, Defendant Board of Regents has the capacity to sue and be sued.  Defendant Board of Regents may be served with a copy of this Complaint and process by serving J. Burns Newsome, Vice Chancellor and Secretary to the Board, at his business address of Board of Regents, Office of Legal Affairs, 270 Washington Street S.W., Atlanta, Georgia 30334.

**<u>FACTS</u>**

**11.**

The Ferst Center for the Arts is a department and/or an operating unit of Georgia Tech.

**12.**

Plaintiff Pacheco initially was hired by Georgia Tech in February 2003 as a contract employee to work in the Ferst Center as a Stagehand.  On or about April 28, 2003, Pacheco's employment was converted to temporary employee status under the "Tech Temp" classification.  On or about September 5, 2005, Pacheco was promoted to the full-time staff position of Program Coordinator/Event Manager.

**13.**

Plaintiff Duncan originally was hired by Georgia Tech on or about April 30, 1998 as a temporary employee (i.e., a "Tech Temp") to work in the Ferst Center as a Stagehand.  While Duncan remained in the temporary employee classification of Tech Temp throughout his employment, he was promoted to the several higher positions during his tenure, including Electrician in 2000, Master Electrician in 2004, and Stage Foreperson (a/k/a Stage Supervisor) in early 2006.

**(Events Relating Primarily to Plaintiff Aishah Pacheco)**

**14.**

Beginning in September 2005 and continuing throughout the duration of her employment as Event Manager at the Ferst Center, Pacheco was repeatedly denied the salary she originally was offered and agreed to by the then-Director of the Ferst

Center, Jay Constantz ("Constantz"), a White male.  At various points in time when Pacheco attempted to follow-up with Director Constatntz and/or with human resources representatives regarding the salary dispute, she was told to "learn to be grateful" and/or to "keep her place."  Pacheco never received the promised compensation and she was consistently paid less than similarly-situated White employees who performed comparable jobs.

**15.**

In or about September 2005, Pacheco was told that she could not use her full name – i.e., Aishah Zuhri-Pacheco – on her business cards because it was "too ethnic" sounding and not acceptable to the college administration.  Thus, the name on her business cards was altered and shortened to simply read: Aishah Pacheco.

**16.**

Pacheco was subjected to a hostile working environment during her employment at the Ferst Center as she was forced to endure numerous racially derogatory comments, sexist statements and remarks, and sexually harassing behavior.

**17.**

For example, during a staff meeting in November 2005, when Pacheco mentioned the possibility of scheduling a Tyler Perry event at the Center, she

received negative feedback from management, including comments such as: (i) "We don't want those kind of people here.  If we let Tyler Perry do his show here, the Ferst Center will become the Black theatre just like the Civic Center"; and (ii) Georgia Tech was not going to appreciate the Ferst Center "changing the climate of Georgia Tech."  Two management level employees – i.e., Chris Dreger (White female) and Brian Rehkopf (White male) – even stated that they would not come to work and would rather use vacation time because "those people would bring trouble and crime."  As threatened, neither Ms. Dreger nor Mr. Rehkopf worked the Tyler Perry show or the advance, thereby forcing Pacheco to manage the front of the house, operations, production and ticketing for the three (3) sold-out shows in December 2005.

**18.**

On a number of occasions during her employment, Pacheco was told by various White management-level employees that she (Pacheco) was "uppity" and thinks too much of herself, and that she "needs to learn to keep her place."

**19.**

Director Constantz repeatedly used the derogatory term "cunt" to describe women, despite Pacheco's direct protestations to him and/or to the Center's

designated human resources representative, Business Manager Kathryn Colegrove ("Colegrove"), a White female.

**20.**

In or about March or April 2007, Pacheco was told by another Center manager, Andre Allen ("Allen"), a Black male, in the presence of Director Constantz, that what she failed to realize is that Constantz is the "master" and Allen is the "overseer" and that she (Pacheco) is "just another one of the slaves." Immediately after this offensive comment was made, Constantz and Allen exchanged a high-five hand slap.

**21.**

Director Constantz stated to Pacheco on several occasions that: "What you don't seem to understand is that men don't like women who know too much." When Pacheco reported the offending comment to the division human resources representative, Betsey Kidwell ("Kidwell"), a White female, Pacheco was told that there was no mechanism in place to compel a director to take any form of sensitivity training.  Kidwell suggested instead that Pacheco contact employee relations to seek help for coping with workplace stress.

**22.**

Constantz made a number of unwelcome and sexually inappropriate remarks to Pacheco, including the following statements: (i) "I see you're wearing your hooker shoes, I guess you'll make some money today"; (ii) "I'll look for you tonight out on Peachtree [Street] after the show. . . . I know you'll be out there because you wore your street walker outfit"; (iii) "You got on your hooker outfit today, I guess you'll be making some extra cash tonight"; (iv) "I think you're great at your job, but I want to see more balance in your life, you need a man. I don't trust women who aren't getting any – they don't make good decisions"; and (v) "I don't see why you keep asking me for a raise when you could just get out there on the street and make plenty of money."

**23.**

During a staff meeting in April 2007, Director Constantz told Pacheco, in the presence of several other management level employees, that Carlton (another male employee) would assist Pacheco "because he wants to screw you."  When Pacheco attempted to complain about Constantz's verbal abuse to the Center's human resources representative (Colegrove), Pacheco was told to "get a sense of humor."

**24.**

Constantz sent Pacheco a number of emails via the Georgia Tech's email system that contained pornographic images and content, many of which depicting male participants engaged in some form of homosexual activity.

**25.**

From late June 2007 until November 2007, Pacheco engaged in a number of meetings with representatives from Georgia Tech's Office of Human Resources ("OHR") to state her concerns and opposition to Director Constantz's increasingly hostile and erratic behavior towards her.

**26.**

When one of the OHR representatives asked Pacheco why she had chosen this time to come forward, Pacheco explained that she had finally reached her emotional limit.  She also told them about the fact that Constantz had begun coming into her office and picking up the photo of her 26 year-old son that was sitting on her desk and making graphic sexual comments about how he could "turn him out" (i.e., sexually).  Constantz went on to state that he thought Pacheco's son was probably a "top" and he commented that he (Constantz) would enjoy "being his bottom."  Because Pacheco's son was coming to visit with her in July 2007, and was planning to attend one of the on-campus shows that Pacheco was

responsible for arranging, Pacheco felt that it was even more imperative to report Constantz's offensive behavior to the Institute's OHR, especially since it appeared that both the Center and division human resources representatives (i.e., Colegrove and Kidwell) apparently believed that Constantz's sexual orientation (i.e., homosexual male) meant that his offensive behavior was a form of protected activity that could not be challenged.

**27.**

When Pacheco asked the OHR representatives if she needed a lawyer to protect her rights or if they thought she should go to the EEOC to file a formal complaint, the OHR representatives told her that Georgia Tech has a policy that required all employees resolve disputes at the lowest possible level and Pacheco had done the appropriate thing by coming to them to allow the college to resolve these issues internally.

**28.**

A few weeks after her initial meeting with the OHR, Pacheco was asked to meet with Kidwell (the division human resources representative) and Dr. William Schafer ("Schafer"), Vice President of Student Affairs, in Dr. Schafer's office. During that meeting, Pacheco was told that she must take responsibility for any communication issues that she had with Constantz, and that she (Pacheco) was

required to censor Constantz in order to prove that she found his sexual comments disturbing. Pacheco replied that she had repeatedly asked Constantz to stop being vulgar in her presence, complained to Kathryn Colegrove ("Colegrove"), the Center's human resources representative, and finally repeatedly warned Constantz that she would seek intervention outside of the department. Kidwell then quipped that Constantz may not have realized that his behavior was offensive because she knows that "you people often use vulgar language in normal conversation." When Pacheco asked Kidwell just who is this "we people you are referring to," Kidwell replied "don't try to make this racial we are trying to help you, I don't mean African-Americans, I meant you people from up North." Kidwell then suggested that Pacheco might be happier working somewhere else. Pacheco waited for Dr. Schafer to intervene but he never did; he just sat there and allowed Kidwell to do all of the talking.

**29.**

Pacheco began suffering even more harassing behavior after making her initial complaint to the OHR, and during July and August 2007, the hostile work environment became almost too much for her to bear. For example, Director Constantz refused to sign Pacheco's tuition reimbursement form, and Kathryn Colegrove (the Center's HR rep) accused Pacheco of bringing "increased scrutiny

to the department and making everyone's life miserable." Crew members were instructed not to speak to Pacheco and she was vilified and isolated. Constantz and Colegrove even announced in a staff meeting that because of Pacheco's reports to OHR, the entire department was in danger of losing their "sole source" privileges used for procurement purposes.

**30.**

In August 2007, Pacheco was told that she could no longer attend a Meeting Professionals International conference for which the budget previously had been approved.

**31.**

In mid-August 2007, Colegrove told the staff that they had to review all of their emails and delete anything that might be considered offensive as "not everyone here has a sense of humor," and that Kidwell had warned her (Colegrove) that the Ferst Center might be subjected to a departmental email search. Director Constantz came into Pacheco's office and said that he was not worried because he knew everything Pacheco had told OHR and he was already prepared for any email search. Constantz also stated that Kidwell and Dr. Schafer had met with him and insisted he purge his emails of anything that could be misinterpreted. Constantz further stated that Dr. Schafer and Kidwell were committed to protecting him and

getting rid of Pacheco as soon as he (Constantz) created the paper trail they requested.  Pacheco contacted OHR and reported all of this information to them.

**32.**

During this same time period, Director Constantz announced that he was going to send a meeting request to the entire staff to attend a weekly one-on-one meeting with him for one hour every week.  Constatnz then went on to say that everyone on the staff except Pacheco was excused from actually attending these weekly meetings.  During the weekly meetings, Constantz berated and demeaned Pacheco, and he detailed the ways in which he intended to make her work life even more miserable than it already was. Thereafter, virtually every day, Constantz and/or his Operations Manager (Andre Allen), wrote emails making false allegations about Pacheco, all of which could be easily disproven.  Pacheco forwarded several of these emails to OHR representative John Schultz.

**33.**

Director Constantz and Operations Manager Allen also threatened several of the Tech Temps who participated in the OHR investigation.  In particular, they singled out Alvin Duncan for the most abuse, telling him that they know it was him and Brenda Brown who "ratted them out to HR."

**34.**

In late-September 2007, OHR sent out a campus-wide email announcing a formalized flex work policy.  When Pacheco applied for flex work, Director Constantz verbally replied: "Don't think for a minute you will be getting any time off.  I told you before the flex work policy is for married women only."

**35.**

In late-October 2007, Pacheco contacted OHR again after Constantz called her a "cunt" in a loud voice in front of the Ferst Center staff.  Pacheco inquired about the results of the investigation into Constantz's behavior and asked specifically about the search of Constantz's computer and the emails he had sent to her.  OHR stated there were no inappropriate emails found either in Constantz's sent folder or in Pacheco's inbox and no evidence of his pornography surfing.  Pacheco went home and located a copy of the only offending email that she had forwarded to her personal email account (i.e., the *Happy Halloween – Not in Mixed Company* email that Constantz previously had sent to her).  Pacheco then forwarded the offending email to OHR representative Laura Lones' work email address as proof.  Curiously, even though Pacheco sent the email several times, each time she called Ms. Lones to follow up, Ms. Lones claimed that she had not

received it.  Pacheco finally asked for Ms. Lones' personal email address, which Ms. Lones provided, and Pacheco sent the email there.

**36.**

In November 2007, Pacheco requested and received a copy of the OHR report that was dated November 14, 2007.  Much to Pacheco's surprise and dismay, even though her meetings with OHR were primarily about Director Constantz's unprofessional and offensive behavior (and the fact that he was using Operations Manager Allen as a surrogate through which to harass her), when the OHR report was released, there was no mention of anything Pacheco had told OHR about Constantz – i.e., the pornography, the racist remarks, the sexual harassment, and the threats were all completely excluded.  Instead, the OHR report read mostly about the issues with Allen and his habit of intimidating employees, and then recommended the immediate dismissal of Allen.  (Allen subsequently was fired in mid-December 2007.)  There was only a passing reference to Constantz's need for management training and that he should be cautioned not to engage in retaliatory behavior.  Amazingly, the OHR report also stated that Pacheco needed to take classes to learn to better handle workplace conflict and stress.

**37.**

In January 2008, Kidwell (the division HR representative) asked Pacheco to meet with her to discuss the final report from OHR.  Kidwell instructed Pacheco to enroll in the training courses recommended in the report, and Pacheco informed Kidwell that she felt the recommendations were demeaning because the inference was that she (Pacheco) did not provide good customer service and was incapable of handling workplace stress.  Pacheco also asked once again if the division was going to make Director Constantz take some sort of sensitivity training and if Dr. Schafer had admonished him to stop introducing lewd, sexual commentary into their workplace communications.  Kidwell replied that she and Dr. Schafer had discussed the matter with Constantz and advised him to discontinue this behavior, but she could provide no guarantee that Constantz would comply.  Kidwell then reiterated that and if Constantz continued to refer to women as "cunts" or subjected Pacheco to other sexual commentary, it was Pacheco's responsibility to inform Constantz that she was being made uncomfortable and that he must stop it. Pacheco again replied that she thought it was the college's job to censor Constatntz, not her's.  Kidwell told Pacheco that they had written Constatnz a letter and that she sincerely hoped he would correct his behavior, but that was all they were able to do about the situation.  Kidwell further stated that she "wondered if

[Pacheco] had started looking for another job yet," to which Pacheco replied, "why should I look for a job, I'm not the one sending porn to subordinates or making sexual comments at work."  Kidwell remarked that she wished they could do more to help her but at this point they could not.

**38.**

Pacheco then told Kidwell that she had been tortured by Constantz for more than a year and that both Kidwell and Colegrove had been fully aware of the situation and neither had done anything to alleviate her suffering or compel Constantz to amend his behavior.  At that point, Kidwell became angry and asked Pacheco if she knew that Kidwell was a criminal court judge in Heard County. Kidwell then stated that because of her judicial experience, she was fully empowered by Dr. Schafer to handle all division HR matters however she decided. Pacheco told Kidwell that she was not intimidated by the fact that Kidwell was a judge because clearly she could not discern unlawful behavior when it was staring her in the face.

**39.**

By January/February 2008, Director Constantz and Business Manager/HR Representative Colegrove had virtually eliminated a vast majority of the Center's regular stage crew (i.e., Tech Temps) and replaced them with an outside vendor,

Umbra Ventures, owned by Magus Tenebrae ("Tenebrae").  Both Pacheco and Master Electrician Lela Huff (Black female) made several complaints to Colegrove about Tenebrae's lewd behavior – e.g., that he was constantly leering, making sexual comments and rubbing his crotch.  Colegrove simply told them that needed to grow a thicker skin if they were going to survive in this industry. Their complaints were otherwise ignored.

**40.**

Director Constantz remained hostile and threatening towards Pacheco, especially whenever he was able to corner her alone, usually in the theater. Constantz continually told Pacheco that "he and Kathryn [Colegrove] are building a paper trail and [Pacheco's] days are numbered."  There also, however, appeared to be a growing tension between Colegrove and Constantz, and while Constantz was out of the office, Colegrove began issuing directives to the staff stating she is "now running the department."  As a result, no one was certain about chain of command, and directives were being issued and rescinded, and then re-issued multiple times per week.

**41.**

In or about February 12 - 14, 2008, Constantz began following Pacheco around in the theater building again.  He followed her up to the control booth and

said he would like to take her somewhere nice.  Pacheco declined.  Constantz then told her that Dr. Schafer said that she was required to meet with him (Constantz) outside of work to demonstrate her willingness to work to resolve their HR issues. Pacheco told Constantz that she would check her schedule and get back to him. She then sent an email to OHR rep Laura Lones and division HR rep Betsey Kidwell advising them of Constantz's request.

**42.**

On February 20, 2008, during a lecture at the theatre at which both the President of Georgia Tech and Vice President Schafer were in attendance, Constantz chased Pacheco through the lobby, grabbed her and pulled her by the arm into the  Westbrook Gallery.  Constantz was highly agitated and told Pacheco that Dr. Schafer had told him to speak to her.  Constantz then told Pacheco that she must recant her statements to OHR or "there will be hell to pay."  Pacheco pulled away and replied that she has been here in hell at the Ferst Center for so long it feels like normal life.  She then told Constantz that there was no need for her to recant because she was certain no one at Georgia Tech was going to do anything anyway. At that point, Constantz told Pacheco that if she will retract her statements, they could start over fresh, and that he would process her pay raise to bring her up to the $43,000 salary he originally offered her in 2005.  By that time,

the lecture was ending and the audience was entering the lobby, so Pacheco left the gallery and walked very quickly up to Dr. Schafer, who was walking with the President.  After greeting the President, Pacheco turned to Dr. Schafer and said, in a voice loud enough for the President to hear, "Jay [Constantz] just chased me through the theater because you told him I had to be made to recant, thanks for once again putting a target on my back."  She then walked away.

**43.**

On February 21, 2008, the entire staff received an email from Constantz stating that he will be absent from the office but will come in for season shows. The very next day (February 22), Constantz returned to the office seemingly "medicated" and talking loudly.  Colegrove asked Pacheco if she had "seen the emails," but Pacheco had just walked into the office from the theater.  Colegrove and Marketing Manager Stephanie Lee ("Lee") then told Pacheco to leave immediately.  Pacheco went over to the theater to the production office downstairs and asked Paul Cottongim ("Cottongim"), Interim Operations Manager, what was going on.  Ultimately, Constantz came over to the theater ranting, screaming Pacheco's name, and generally more agitated than she had ever seen him before. Pacheco took off running from him.

**44.**

On February 26, 2008, Pacheco left work in the early afternoon because she was sick.  Pacheco went to her doctor the next day and was told that her blood pressure was exponentially higher than the doctor had ever seen it.  Her doctor was extremely concerned and she gave Pacheco a prescription for anti-anxiety medication along with instructions to rest for two weeks.  She also provided Pacheco with a doctor's note.  When Pacheco returned to work the following day, she advised Stephanie Lee of the doctor's orders, and she also told Lee that she had several advances that she needed to get completed before going back home.  Later that afternoon, Lee told Pacheco that Kidwell had denied her sick leave request and that Pacheco must return to work or be terminated, regardless of the doctor's note. Pacheco complied with the directive.

**45.**

In March 2008, Ballethnic Dance Company complained about phantom labor charges and excessive ticket fees on their settlement statement. Colegrove agreed to remove the charges.  Soon thereafter, Kidwell had a rather loud disagreement with Colegrove in the office suite, during which Pacheco overheard Kidwell say that Umbra Ventures does not have the required insurance, background checks, or key clearance forms (although they all have keys).  Kidwell

also said that Umbra Ventures has been paid nearly than $70,000 and there is some issue about their Tax ID number.  Later that day, Colegrove came into Pacheco's office and told her to shred any time sheets that she has with Umbra Ventures crew hours on them. When Pacheco refused to do so, Colegrove accused Pacheco of being "ungrateful" after she (Colegrove) and Kidwell had stood up for her against Constantz.  Pacheco told Colegrove that no one ever stood up for her and if Colegrove wanted to commit a crime by destroying financial records she needed to do it herself.

**46.**

On April 4, 2008, Dr. Schafer announced during a department staff meeting that Jay Constantz will no longer be working at the Ferst Center and that Stephanie Lee was now the Interim Director.  Dr. Schafer also announced that Colegrove had found an outside consultant who will study the Ferst Center and issue recommendations.  Pacheco then inquired of Interim Director Lee when her personal HR and compensation issues will be addressed, and Lee replied: "Dr. Schafer has stated that all issues will be addressed once he receives the consultant's report."

**47.**

In September 2008, several additional key incidents happened in rapid succession.

(a)     The consultant's assessment report was completed and it documented the fact that the rental division was responsible for 63% of all operations and $506K in revenue.   Pacheco was the only staff person in the rental division. Pacheco then asked to meet with Dr. Schafer to finally address her salary and classification issues, but Kidwell denied the request.

(b)     During several planning meetings for the upcoming season, Colegrove, Interim Director Stephanie Lee, and Interim Operations Manager Paul Cottongim discussed Colegrove's plan to eliminate payment of overtime to non-exempt employees by providing food in lieu of pay.   Pacheco objected and advised Colegrove and Lee of the repercussions of violating FLSA regulations.   Pacheco also told them that "people once worked for food, they called it slavery."   Pacheco further implored them to consider how traumatized everyone already was from the insanity of the prior season.   Someone apparently advised Kidwell of Pacheco's stated concerns because Kidwell came into Pacheco's office and told her that Georgia Tech has negotiated a special provision with the state that allows them to forego paying overtime.   Kidwell also warned Pacheco that she had better not find

out that Pacheco had made any reports outside of the department.  Kidwell then told Pacheco she stills has a job only because of her (Kidwell's) kindness because "very important people in OHR and Dr. Schafer are furious about the intense scrutiny [Pacheco] has brought to each of their departments and they want [Pacheco] fired."

(c)     On September 26, 2008, following the Arrested Development show at the theatre, one of the brakes failed overhead and an arbor plunged 65 feet down to the deck.  Fortunately, no one was on stage to get hurt.  Colegrove told the staff that no one should complete incident reports or put anything in writing, and Cottongim then communicated this directive to the crew.  Nevertheless, Tech Temps Alvin Duncan and Mike Sansom (White male) put their concerns for the crew's safety in writing.  Thereafter, Interim Director Lee and Colegrove called a meeting with Pacheco, Cottongim, and Messrs. Duncan and Sansom.  During this meeting, Colegrove presented everyone with copies of the fly rail system inspection report and advised them to cherry pick repairs that will cost less than $5,000 that will make the fly rail "safe."  Note that the repairs required actually were in excess of $80,000.  Pacheco and Messrs. Duncan and Sansom declined to participate, stating that they were not qualified to make these types of judgments.

Cottongim then told Lee that he and Colegrove would work together to "patch things up."

**48.**

Feeling overwhelmed by all that was happening and had happened to her, Pacheco spoke with a personal friend who is an attorney and, following his advice, she visited the EEOC office in late September to file a complaint of discrimination.

**49.**

During the October - November 2008 timeframe, and in spite of Pacheco's previous protests, Colegrove, Cottongim and Lee implemented their "food in lieu of overtime pay" policy.  As a result, Tech Temps Mike Sansom (Production Manager) and Alvin Duncan sent email complaints to Interim Director Lee, and filed complaints with the U.S. Department of Labor, Wage and Hour Division. Interim Director Lee subsequently sent an email to the crew, apologized, and stated that she will pay the overtime due to the crew.  The crew members requested copies of their time sheets in order to reconcile the missing hours.  Some of the crew members also requested copies from Pacheco since she would have copies in each client's file in order to document the fees that were charged.  Colegrove approached Pacheco and instructed her to shred the time sheets that contain overtime hours.  Pacheco again refused to destroy any documents and told

Colegrove that she would have to do it herself.  Colegrove then threatened Pacheco by stating that she (Colegrove) and Kidwell could eliminate Pacheco's job with a few keystrokes.

**50.**

On December 16, 2008, Pacheco was out of the office because she was sick. Interim Director Lee called Pacheco on her cell phone and left a voicemail message saying that she needs to speak with Pacheco.  When Pacheco called her back, Lee told her to come into the office so they could have an important meeting. Pacheco asked Lee what she wanted to discuss, but Lee said she preferred to talk face-to-face.  Pacheco then told Lee that she is really sick and they ultimately agreed to talk when Pacheco returned to work.

**51.**

On December 18, 2008, a belligerent courier sent by Georgia Tech arrived at the home of Pacheco's elderly parents and began ringing the doorbell and banging on the door and loudly calling out Pacheco's name.  The courier's actions were extremely frightening to Pacheco's 80 year-old mother, who was at home alone. When Pacheco's mother slightly opened the door to tell the man that Aishah Pacheco does not live there, the courier told her that he was from Georgia Tech and that she must give him Pacheco's address.  When Pacheco's mother refused

and started to close the door, the courier yanked against the screen door, breaking the latch, put his foot against the door to hold it open and threw a letter at Pacheco's mother.   He then stated that the letter was now officially delivered because it had touched her.   This incident left Pacheco's 80 year-old mother shaken and in tears. When Pacheco's nephew arrived at the house soon afterwards, he called Georgia Tech President's Office to report the incident.   His call was returned by Kate Walsch, a Georgia Tech attorney, who took his statement and said she would investigate.   No one in the family told Pacheco about this particular incident at the time because they knew she already was very sick.

**52.**

On Friday, December 19, 2008, Pacheco called to check in with Lee and to let her know that she would be out another day.   Lee's phone went directly to voice mail. Later that evening, Pacheco checked her personal email folder and found multiple emails entitled: *Important Notice, Sick Leave not Approved for Today and Contact Betsey at GT.*   Included among the various emails was a message advising Pacheco that her employment had been terminated, along with another copy of the letter that had been delivered to her parents' home.

**53.**

On Saturday, December 20, 2008, Pacheco arrived at the Ferst Center just before curtain time at the theatre to return her keys to Interim Director Lee and to make certain that the ten (10) or so guests that she had invited to attend the performance would be able to pick up their tickets. To her surprise, Pacheco walked in and found pandemonium in the very crowded theater lobby. After greeting several patrons, Pacheco walked up to Lee and told her that she had received the email message about her discharge and she then asked Lee what all the commotion was about in the theatre lobby. Lee then told Pacheco that there were many people with duplicate tickets. At that point, Pacheco asked Lee if she needed her help and Lee replied, "you would do that for me?" Pacheco responded: "Right now, this isn't about anything but this client and their show." Pacheco then went over to the box office to assist the worker (Kristen) get things straightened out.

**54.**

When the lobby was nearly clear, Pacheco walked over to the patrons' services window to distribute her guests' tickets to them. Helena Clay, Nena Gilreath, and Bill Leavell were among the people waiting for her. Pacheco then told Lee that she needed Lee to give her a receipt for returning her keys and P-Card

so that Pacheco could go into the theatre with her friends to watch the show.  At that point, Pacheco asked one of the ushers to hand her some paper and scissors. Pacheco then cut up her P-Card and began to list the serial numbers on the keys that she was returning.  Alvin Duncan also had called Pacheco on her cell phone to check on her and she was on the phone with him reassuring him that she was alright.   Helena Clay was waiting for Pacheco so they could sit together and Raymond Cody walked over to greet Pacheco as she was writing out the receipt. Lee was facing Pacheco and appeared to be very emotional.   After thanking Pacheco for helping out, Lee then said how sorry she was and that the discharge was not her idea but her hands were tied because Pacheco went outside of the college and made reports to EEOC, so there was no way she (Lee) could save Pacheco.  Lee also said something to the effect that things had gotten very ugly and that she (Lee) had been terribly traumatized and sickened by the entire situation.

**55.**

During this conversation, Nena Gilreath walked up and stood there listening for a moment or two, reached for her tickets and then hugged Pacheco and said she was going to sit down because she was "not interested in hearing anymore of this crap."   Helena Clay also was standing there listening to Lee's comments. Raymond Cody turned to Lee and began chastising her, stating: "What do mean

you fired her for making a report to EEOC – that is her right."  Mr. Cody told Lee that she "had some nerve talking about how traumatized she was, this girl is out of a job."  He then told Lee that she should be ashamed of herself and that the theater was finally doing high-end events because of Pacheco.  Lee was very upset and kept saying she "knew this was ugly and wrong but there was nothing she could do."  Brenda Brown also came over from the concessions gallery and overheard Lee apologizing and saying: "Why did you have to go outside to EEOC, we could have handled this internally."  Ms. Brown then told Lee that she (Lee) knew we had all tried to resolve issues internally but Kathryn Colegrove and Betsey Kidwell had no concern for anyone but themselves.  Ms. Brown then started to recite quotes from the Bible.  At that point, Pacheco said that she was there to see the show and Pacheco and Helena Clay then went into the theatre to find their seats.

## 56.

In February 2009, the Georgia Tech African-American Student Union ("AASU") had their annual Black Leadership Conference scheduled for late February.  AASU had hired Pacheco with their private funds to serve as their event and production manager.  When the group advanced the event with the Ferst Center staff, Chris Dreger (White female) told the students they could not hire Pacheco because she was not allowed in the Ferst Center.  When Kelli Stancil

(Black female student) submitted Pacheco's invoice for payment, she was called into Kidwell's office.  Kidwell then told Ms. Stancil that the AASU could not hire Pacheco because she had been fired for engaging in "criminal activity" and Kidwell wanted to protect AASU from Pacheco.  When Ms. Stancil inquired as to what kind of criminal activity, Kidwell told her that Pacheco had filed false charges against Georgia Tech with the government and was going to be prosecuted for it.  AASU met to discuss the situation and the students insisted that the invoice for Pacheco's services be processed.   In response, Kidwell required AASU to amend some of the wording on Pacheco's invoice.  AASU students continued to encounter harassment from Kidwell for their events in April 2009, February 2010, and March 2011, because of their selection of Pacheco to serve as conference manager.  The students complained to both Dr. Schafer and President Peterson about Kidwell's harassing behavior.

**57.**

On several different occasions in March 2009, November 2009, March 2010, and November 2010, Ballethnic Dance Company ("Ballethnic") also encountered problems with Center management officials, specifically, Chris Dreger ("Dreger"), because of the hiring of Pacheco to work Ballethnic's shows at the Ferst Center. Dreger told Ballethnic that Pacheco was not allowed in the Ferst Center and that if

Pacheco was present, Ballethnic must buy additional insurance if Pacheco was going to be in the building.   Ballethnic's representative told Dreger that they were not going to participate in her games and that Ballethnic was already insured. Nevertheless, Dreger continued to make complaints to Ballethnic each time they hired Pacheco, repeatedly stating that Pacheco was not allowed at the Ferst Center.

**(Events Relating Primarily to Plaintiff Alvin Duncan)**

**58.**

On December 13, 2006, Plaintiff Alvin Duncan received a call on his cell phone from Director Constantz informing him that Operations Manager Brian Rehkopf had been fired and that Constantz wanted to meet with Duncan in his office the next day.   During that meeting, which also was attended by Business Manager Kathryn Colegrove, Constantz told Duncan that he would be conducting a search for a new Operations Manager, and that he had decided to convert three (3) backstage Tech Temp positions into permanent positions with benefits, including Duncan's position as Stage Manager.   Duncan told Constantz that he was pleased to hear that and asked him about a previous request for a raise in pay that he had submitted to Mr. Rehkopf before he was fired.   Constantz said that he had received the request and was going to grant it.   Duncan thanked him and they then discussed the operation of things backstage and Duncan conveyed to Constantz

that the Center was short on qualified technicians and backstage crew. Duncan asked if it was possible to add more people to their contact list and Constantz said that it was. Constantz also said that Colegrove, as the Center's HR representative, would assist in processing the applications. Constantz ended the meeting by saying that he planned to make all of the changes that had been discussed by the beginning of the new fiscal year in July 2007.

**59.**

In January 2007, Duncan began the process of hiring additional qualified stage crew and over the next couple of months, approximately 20 qualified technicians were added to the backstage contact list.

**60.**

In March/April 2007, Contantz announced that he had decided to make Andre Allen the Interim Operations Manager and Paul Cottongim the Interim Technical Director. Constantz further stated that both men would continue to be paid hourly as tech temps but would go to salary in June 2007.

**61.**

In June 2007, it came to Duncan's attention that Event Manager Aishah Pacheco and Interim Operations Manager Andre Allen were in dispute. Pacheco was asserting that Allen was assigning much of his work to her, and Duncan also

began to notice a change in Allen's attitude towards himself and the crew at this time.  For example, the previous month, Allen had told a new rental client (i.e., Rhythm Dance Center) that during rehearsal the stage crew did not have to take a meal break.  Allen insisted the crew would work through the entire rehearsal if the client would just order pizza.  Allen told the client that "the crew could eat at their work stations." The client saw no need to change the schedule and refused the offer.  Also during this time, Interim Technical Director Paul Cottongim first mentioned to Duncan his idea to bring in a labor company to serve all of the theater's labor needs.  Cottongim noted that he was going to make the suggestion at the next staff meeting and recommend to Constantz and Colegrove a company that he (Cottongim) was familiar with called Umbra Ventures, which was owned by Megus Tenebrae.  Cottongim said that because he would be part of the selection process, he would have access to all of the competing bids and, therefore, he could advise Mr. Tenebrae how low to make his bid.

**62.**

Beginning in July 2007, an investigation was being conducted by OHR representatives John Schultz and Laura Lones.  Over the next several weeks, they interviewed the Center's administrative staff, backstage crew, student ushers, Constantz and Allen.  Duncan was personally interviewed by OHR during the

course of the investigation and was told that all information gathered from these interviews would be used for the final report.

**63.**

In August 2007, while Duncan was setting up a table for use backstage, Allen walked past him and claimed that Duncan purposely struck him with the table. Even though Duncan never touched him, Allen insisted that Duncan had and threatened to have Duncan fired. Allen walked up to Duncan and proclaimed that "every action I take against you is backed by the full authority of both Jay [Constantz] and Kathryn [Colegrove]," and if he (Allen) wanted Duncan fired, he could have him fired. After he left the stage, Duncan told Cottongim what had just happened and the next morning Duncan reported the incident to Colegrove via email. Duncan also made an appointment to meet with OHR representatives John Shultz and Laura Lones about the incident. Colegrove responded via email stating that these matters must be "resolved at the lowest levels of the department." Duncan met with the OHR representatives after work and gave them his account of what had happened. Mr. Schultz suggested that Duncan immediately go to the Georgia Tech police and file a formal complaint against Allen, and Ms. Lones agreed with him. Duncan also mentioned to the OHR reps that the theatre's fly rail system was in need of service and that his (Duncan's) requests for these

maintenance services had been ignored over the past two months.  Ms. Lones made note of this and Duncan left the OHR and went over to the Georgia Tech police to do as Mr. Schultz had suggested – i.e., file a complaint and make a record of the incident.

**64.**

In September 2007, Umbra Ventures became a vendor for the Ferst Center and was being used as the primary labor source.   Unlike the Tech Temp employees, none of Umbra Ventures' crew members were required to submit to a drug test, a criminal background check, or required to submit a resume or present any references.  As a result, many of the new Tech Temp who were hired in the February-March 2007 timeframe were not called in to work.   In the months following their retention, the crew of Umbra Ventures (all white) and the company's owner Megus Tenebrae, rapidly received raises in pay that were in excess of the initial bid that had been submitted for the contract.

**65.**

On November 14, 2007, the OHR concluded its investigation and issued a report, which included the recommendation that Allen be terminated immediately. The report also noted that Constantz should enroll in management training courses.

**66.**

On December 17, 2007, a comprehensive inspection of the theater's fly rail system was conducted.   The multi-page report detailed line by line what was needed to bring the system up to code and pointed out that "initial installation of the system" was not done correctly and those issues needed to be addressed.   Lack of routine maintenance was also cited.   The report categorized a number of items as "in need of immediate attention."   The report estimated the cost of all repairs to be $80,000-$85,000.   Copies of the full report were issued to all staff at the next staff meeting.

**67.**

In March 2008, it was announced by Stephanie Lee and Kathryn Colegrove that Jay Constantz was no longer the Director and that Stephanie Lee would now serve as Interim Director until the position could be filled permanently.

**68.**

In April 2008, the entire staff was assembled on stage for a staff meeting. Colegrove attended the meeting and addressed the staff.   Interim Director Lee remained seated and did not speak.   Colegrove focused on the budget throughout the meeting and established early on that there were not sufficient funds available for maintenance of the fly rail system or the hydraulic lift which now had begun to

stall in mid-air.  Colegrove also said that we were all expected to continue and be prepared to work at an accelerated pace because she and Lee were working together to book the next season's line up of shows.

**69.**

On June 6, 2008, during another staff meeting, Colegrove stated that the department is under increased scrutiny and the OHR requires that all Tech Temps must be placed on a 30-day furlough this year, and that the dates for the furloughs will be issued in the future.

**70.**

In August 2008, the fly rail system and hydraulic lift were both showing more signs of deterioration, and both had become unsafe and unreliable.  In a staff meeting, Cottongim claimed that he could provide temporary repair solutions for the lift at minimal or no cost.  It then was decided by Cottongim, Colegrove and Lee that the condition of the equipment did not pose a safety threat to the stage or the crew.  Despite Cottongim's repairs to the lift, it continued to stall in mid-air.

**71.**

On September 26, 2008, a rope lock failed during the post-show clean-up causing a baton to fly above the stage and the counterweight/arbor to crash to the deck damaging the fly rail.  There were several witnesses to the failure, including

members of the band Arrested Development. Immediately following the incident everyone was shocked. Cottongim's reaction was to say "it would not be necessary to fill out an incident report because no one was injured." Duncan expressed to Cottongim his intention to not only document the incident but also notify Interim Director Lee via email of his concerns for the safety for all who work on stage. Tech Temp Mike Sansom also expressed his intent to do the same. Duncan and Sansom contacted Lee via separate emails the next morning. Lee immediately called a meeting to discuss the findings of the fly rail system report. She expressed that Dr. Schafer had heard about the incident and he was taken aback at how word of the incident had quickly spread throughout the division.

**72.**

On September 30, 2008, Duncan filed a charge of discrimination with the EEOC against the Ferst Center for discriminatory practices in the areas of compensation and unfair labor practices based on race. Duncan also cited the lack of diligence and loose interpretation of OHR policy exercised in the Umbra Ventures situation. Duncan noted that several crew members of Umbra Ventures had been granted GT BUZZ cards for unlimited access to the facility and all of its technical equipment, keys to concessions inventory, and keys to the Center's van.

Moreover, several Ferst Center crew members had begun to complain that personal items such as laptops and tools had been stolen.

**73.**

On October 3, 2008, Duncan found a discrepancy on his paycheck – i.e., that he was short three (3) hours of overtime pay – and he immediately addressed this issue with Cottongim, who replied that it was possible he (Cottongim) had made a mistake when calculating Duncan's time and that Duncan would receive it on the next paycheck.  When Duncan asked to see the sign-in sheets for the last pay period to check the hours himself, Cottongim told him that Stacey Melich has the sheets in the administrative office and "you can see them when she has finished." Cottongim then told Duncan that he and the crew should expect to receive only 30 minutes between shows (i.e., Capital Steps) instead of the normal 60 minute dinner break that evening.  He went on to say that it had been decided by Colegrove and Lee to add a second show for that night.  Cottongim said Colegrove would provide food, and Duncan was to inform the crew of the schedule change.  Cottongim's manner became hostile when Duncan asked him whether he knew if this was in accordance with state DOL guidelines for meal breaks. Duncan then informed the crew of the new schedule.  By mealtime, the food had not arrived and the crew had to wait an additional 10 minutes before they could eat, which left just 20 minutes

to eat and use the bathroom before the crew had to prepare for the second show. Several crew members expressed their dissatisfaction about the lack of notification regarding the change in schedule.  At the end of the second show, Duncan went home with a migraine headache after having worked a total of 12 hours that day.

**74.**

On October 15, 2008, at the request of the Ferst Center crew, a meeting with Kidwell, Colegrove and Cottongim was arranged by Interim Director Lee in order to discuss the reclassification of long time Tech Temp employees. It was presented to Kidwell that all of the tech temp employees were told by the administration that filing for unemployment benefits during slow work cycles (July & January) was grounds for immediate termination.  It was pointed out by the crew that according to the Georgia Tech Tech Temp handbook, this was not the case. It also was pointed out that there was a classification of "Partial Year" employee that could earn benefits, including sick and vacation, and that this classification of worker was required to take a 30-day furlough each year.  It was the crew's assertion that this classification more accurately described how they functioned as employees at the Ferst Center.  Kidwell appeared frustrated and responded: "I have not read this policy in a few years, I do not read it every day like you people."  Kidwell then expressed her need to leave. The crew that attended this meeting asked if they

could please meet with someone from OHR that could better answer their questions.   Lee said she would arrange another meeting with an OHR representative.

**75.**

On October 16, 2008, Duncan noticed that there was still a discrepancy on his paycheck and that he had not received the three (3) hours of overtime from the previous pay period.   Duncan again immediately addressed this issue with Cottongim, who told him that the sign-in sheet Duncan was requesting was not among the other sheets sent back to the Production Office.   Duncan then called Stacey Melich in the administrative office and she told him that all of the sign-in sheets had been sent back to Cottongim.   No one could account for the missing sign-in sheet.

**76.**

On October 28, 2008, Duncan called the OHR to make a formal request to review his personnel records, employee file, and the sign-in sheets that were on record from the Ferst Center.

**77.**

On October 29, 2008, Duncan met with the OHR.   He noticed that some sign-in sheets were missing and some pay periods were incomplete.    He then

asked the OHR administrator if there were more sheets and she informed him that they only receive what the Ferst Center sends to them.

**78.**

On November 3, 2008, members of the Ferst Center crew, including Duncan, had a meeting with Brenda White, an OHR Senior Director, along with Colegrove, Lee and Cottongim.   Ms. White announced to all in attendance that in the past, the Center was correct in the administration of Georgia Tech policy as it pertained to Tech Temp employees and overtime pay.   When the issue of Partial Year employee classification was raised by members of the crew, Ms. White was not familiar with the policy and asked where did they "get that information."  She was then told by Mike Sansom that the information was available on the OHR website.   Ms. White claimed that she had reviewed all Ferst Center sign-in sheets and insisted that everyone had been properly compensated for overtime. Immediately after this meeting, Cottongim warned the crew that by "asking too many questions you are opening a nasty can of worms."

**79.**

On November 5, 2008, Duncan contacted the U.S. Department of Labor ("DOL") via email.

**80.**

On November 6, 2008, Cottongim informed Duncan that he has sign-in sheets dating back to July 2008, and that all documents dated prior to July are in the administrative office.

**81.**

On the evening of November 7, 2008, before an event at the theatre, Duncan asked Interim Director Lee for an opportunity to view all of his sign-in sheets that are kept in the administrative office and he also informed her that he had contacted both the EEOC and the DOL.

**82.**

On November 10, 2008, Duncan received an email from Cottongim indicating that he is to be furloughed from December 22, 2008 until January 20, 2009.  It was later explained to Duncan and members of the crew by Cottongim and Lee that in order to comply with OHR policy, all Tech Temps were required to take 30 furlough days.  Lee went on to say that it was her intention to "rehire everyone back after the furlough, however, [she] cannot give you a written statement promising that."

**83.**

On November 12, 2008, Duncan received permission from Lee to come over to the administration office to make copies of his sign-in sheets that were on file. What Duncan found were stacks and stacks of papers on the floor of the office. Nothing was in order or even filed in folders.  Some stacks were in a cardboard box and no one offered an explanation for the condition that these files were kept in.  Duncan was unable to go through all of the stacks of paper and eventually Brenda Brown was asked to come to the office and help sort through the stacks. Stacey Melich, the Administrative Assistant, never offered to help sort through the mess.  Eventually, Duncan had to abandon any attempt to make more copies because he had to return to work.

**84.**

On December 16, 2008, Duncan was fired without notice or prior warning when he arrived to work that morning.  Duncan was preparing for a load-in for an upcoming show (Chocolate Nutcracker) that weekend when Cottongim came to the stage and told Duncan that Stephanie Lee wanted to see him in her office.  After giving some directions to the crew, Duncan went to Lee's office where he found Interim Director Lee and Betsey Kidwell waiting for him.  Without hesitation, Lee informed Duncan that his "services are no longer needed" and that he must give

her his keys and "leave the premises immediately."  When Duncan asked Lee why

he was being fired, Kidwell responded by saying "you are a Tech Temp and we do

not have to give you a reason, you need to leave."  Duncan gave Lee his keys and

went back to collect his personal belongings.

**85.**

On December 22, 2008, Duncan received a phone call from David Ampong

(Black male), another crew member at the Center.  Mr. Ampong was very upset

and angry.  He told Duncan that the show that weekend was a horrible experience

for everyone because after Duncan left, no one had any information about the light

plot or any details about the set up for the Chocolate Nutcracker.  He also said that

additional labor had to be hired at "increased production costs to the theater"

according to Cottongim.  Mr. Ampong then informed Duncan that Cottongim had

gathered the crew together and told them that the reason Duncan had been fired

was because he went outside of the Georgia Tech system and filed an EEOC

complaint, and that this was a lesson to everyone that you do not go outside of the

division if you have a problem.  Upon hearing this, Duncan immediately sent an

email containing a cease and desist letter to Vice President Schafer's office

demanding that the Center staff refrain from slandering him and his reputation as a

professional in this industry.   Duncan never received a response from Dr. Schafer.

**(EEOC Determinations and Issuance of Notices of Right to Sue)**

**86.**

With respect to Aishah Pacheco's claims of unlawful discrimination and retaliation, the EEOC issued a "Determination" letter dated April 28, 2011, which included the following specific findings:

> The evidence does reveal however that [Pacheco] was paid less than White similarly situated employees because of her race, African-American. Examination of the evidence reveals that similarly situated employees who did not engage in protected complaints but had less seniority were not laid off. Examination of the evidence further reveals that there is a nexus between [Pacheco's] protected complaint and her discharge. There is also direct evidence of retaliatory animus with respect to negative references.

> Based on the above and the record as a whole, there is reasonable cause to conclude that [Pacheco] was denied equal wages because of her race and discharged in retaliation for having engaged in a protected activity in violation of Title VII.

**87.**

With respect to Alvin Duncan's claims of unlawful discrimination and retaliation, the EEOC issued a "Determination" letter dated April 28, 2011, which included the following specific findings:

> The evidence does reveal however that there is a nexus between [Duncan's] protected complaint and his discharge. Examination of the evidence further reveals that [Duncan] was replaced one day after his purported layoff.

Based on the above and the record as a whole, there is reasonable cause to conclude that [Duncan] was discharged in retaliation for having engaged in a protected activity in violation of Title VII.

**88.**

On July 5, 2013, the United States Department of Justice, Civil Rights Division, issued a Notice of Right to Sue to Aishah Pacheco. Pacheco received the right-to-sue letter on July 16, 2013.

**89.**

On July 5, 2013, the United States Department of Justice, Civil Rights Division, issued a Notice of Right to Sue to Alvin Duncan. Duncan received the right-to-sue letter on July 12, 2013.

## COUNT I

## RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII

**90.**

Plaintiffs Pacheco and Duncan re-allege and incorporate by reference herein the allegations set forth in Paragraphs 1 through 89 as if fully restated hereinafter.

**91.**

At all times relevant to this action, Defendant Board of Regents d/b/a Georgia Tech was an "employer" as defined in Section 701(b) of Title VII (42 U.S.C. § 2000e *et seq.*).

**92.**

Plaintiffs Pacheco and Duncan have fulfilled all jurisdictional prerequisites to the institution of a suit under Section 706 of Title VII, as follows:

(a)    Pacheco and Duncan filed timely *Charges of Discrimination* with the United Stated Equal Employment Opportunity Commission;

(b)    Pacheco and Duncan received separate *Notices of Right to Sue* from the United States Department of Justice, Civil Rights Division; and,

(c)    Pacheco and Duncan filed this Complaint within ninety (90) days from their respective receipt of the *Notices of Right to Sue* from the United States Department of Justice, Civil Rights Division.

**93.**

As a result of the actions of Defendant Board of Regents d/b/a Georgia Tech, Plaintiffs Pacheco and Duncan have endured discriminatory, disparate treatment as compared to similarly-situated White employees.

**94.**

Defendant Board of Regents d/b/a Georgia Tech's discriminatory actions against Plaintiffs Pacheco and Duncan also resulted in Plaintiffs suffering from adverse employment actions.

**95.**

Defendant Board of Regents d/b/a Georgia Tech performed the above actions willfully, wantonly, intentionally, and in reckless disregard of Plaintiffs' federally-protected rights.

**96.**

Defendant Board of Regents d/b/a Georgia Tech violated Title VII by discriminating against Plaintiffs due to their race. Plaintiffs are entitled to all remedies authorized by Title VII, including special, compensatory and punitive damages, and recovery of expenses of litigation, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## COUNT II

## RETALIATION IN VIOLATION OF TITLE VII

**97.**

Plaintiffs Pacheco and Duncan re-allege and incorporate by reference herein the allegations set forth in Paragraphs 1 through 96 as if fully restated hereinafter.

**98.**

Plaintiffs Pacheco and Duncan were terminated by Defendant Board of Regents d/b/a Georgia Tech from their respective positions with the Ferst Center only after filing charges of discrimination with the EEOC.

**99.**

Defendant Board of Regents d/b/a Georgia Tech's retaliatory actions were done willfully, wantonly, intentionally, and in reckless disregard of Plaintiffs' federally-protected rights.

**100.**

Defendant Board of Regents d/b/a Georgia Tech violated Title VII by retaliating against Plaintiffs.  Plaintiffs are entitled to all remedies authorized by Title VII, including special, compensatory and punitive damages, and recovery of expenses of litigation, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## COUNT III

## GENDER DISCRIMINATION AND SEXUAL HARASSMENT IN VIOLATION OF TITLE VII

**101.**

Plaintiff Pacheco re-alleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 100 as if fully restated hereinafter.

**102.**

Plaintiff Pacheco is a female and a member of a protected class under Title VII.

**103.**

At all times relevant to this action, the relationship between Plaintiff Pacheco and Defendant Board of Regents d/b/a Georgia Tech was a relationship of "employee" to "employer" within the meaning of 42 U.S.C. § 2000e *et seq.*, such that a cause of action exists where discrimination on the basis of sex is alleged to be the cause of an adverse action directed to the employee by the employer.

**104.**

At all times relevant to this action, Jay Constantz was Plaintiff Pacheco's supervisor.

**105.**

Throughout Plaintiff Pacheco's employment, and prior to and/or concurrent with the incidents detailed in paragraphs 21 through 26 above, Defendant Board of Regents d/b/a Georgia Tech knew or should have known of Constantz's propensity to engage in sexually inappropriate and/or harassing behavior.

**106.**

Throughout Plaintiff Pacheco's employment, and even prior to the incidents detailed in paragraphs 21 through 26 above, Defendant Board of Regents d/b/a Georgia Tech took no steps to address the sexually inappropriate and/or harassing behavior engaged in by Constantz.

**107.**

Prior to and throughout Plaintiff Pacheco's employment, Defendant Board of Regents d/b/a Georgia Tech engaged in a practice of permitting the sexually inappropriate and/or harassing behavior towards its employees of the type detailed herein, without retribution.

**108.**

Constantz subjected Plaintiff Pacheco to repeated sexual harassment consisting of unwanted, unwelcome and uninvited sexual comments, and the display of graphic pornographic images.

**109.**

Despite its actual and/or apparent knowledge that Constantz had a propensity for engaging in sexually inappropriate conduct, Defendant Board of Regents d/b/a Georgia Tech continued to employ Constantz and continued to employ him in a supervisory capacity over Plaintiff Pacheco.

**110.**

Defendant Board of Regents d/b/a Georgia Tech actively participated in and/or ratified and approved the unlawful decisions and actions of Constantz.

**111.**

The actions of Defendant Board of Regents d/b/a Georgia Tech and Constantz described in the above paragraphs were the product of unlawful sexual harassment and discrimination, and were not the product of any legitimate, non-discriminatory purpose, motive or intent.

**112.**

Defendant Board of Regents d/b/a Georgia Tech's actions were willful, deliberate, and intended to cause Pacheco harm and/or were committed with reckless disregard of the harm caused to Pacheco, and/or in derogation of her federally protected rights.

**113.**

The ongoing harassment as described herein to which Plaintiff Pacheco was subjected by Defendant Board of Regents d/b/a Georgia Tech because of gender discrimination is a violation of 42 U.S.C. § 2000e, *et seq*., thus entitling Plaintiff Pacheco to all appropriate relief and remedies authorized under Title VII, including back pay and benefits, front pay, compensatory and punitive damages, recovery of expenses of litigation, including reasonable attorney's fees, and all other relief available under Title VII.

## COUNT IV

## ATTORNEY'S FEES

### 114.

Plaintiffs Pacheco and Duncan re-allege and incorporate by reference herein the allegations set forth in Paragraphs 1 through 113 as if fully restated hereinafter.

### 115.

Plaintiffs are entitled to attorney's fees and other costs of litigation pursuant to Title VII and 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Pacheco and Duncan respectfully pray for judgment against Defendant Board of Regents d/b/a Georgia Tech and demand the following relief:

(a) That this Court declare and adjudge Defendant Board of Regents d/b/a Georgia Tech to have engaged in unlawful employment practices in violation of Title VII;

(b) That this Court enjoin Defendant Board of Regents d/b/a Georgia Tech permanently from engaging in unlawful employment practices in violation of Title VII;

(c)     That Plaintiffs Pacheco and Duncan have judgment against Defendant Board of Regents d/b/a Georgia Tech on all counts, in an amount to be determined at trial;

(d)     That Plaintiff Pacheco and Duncan be awarded full back pay, front pay, liquidated damages, compensatory damages, and punitive damages from Defendant Board of Regents d/b/a Georgia Tech;

(e)     That Plaintiffs Pacheco and Duncan recover their attorney's fees and costs and expenses of litigation from Defendant Board of Regents d/b/a Georgia Tech incurred in bringing this action;

(f)     That prejudgment interest be awarded to Plaintiffs Pacheco and Duncan; and

(g)     For all such additional and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs Pacheco and Duncan herein demand a trial by jury of all issues in this action.

Respectfully submitted this 10th day of October, 2013.

*/s/ Gary E. Thomas*
**Gary E. Thomas**
Georgia Bar No. 704860
*Counsel for Plaintiffs*

**GARY E. THOMAS, ATTORNEY AT LAW**
2180 Satellite Blvd. Suite 400
Duluth, Georgia 30097
(770) 239-1785
(770) 995-2554 {facsimile}
*gary.thomas@gthomaslawfirm.com*